UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYED SAMIR HOUSSAIN, and all other individuals similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> KENNETH CHENAULT, MEREDITH COSGROVE, STEPHEN FERRIS, DEAN VOCATURO, JOHN KOSLOW,  PETER SISTI, and AMERICAN EXPRESS COMPANY, <br><br> Defendants. | **COMPLAINT** <br><br><br> JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiff Syed Samir Houssain ("Plaintiff"), by and through his attorneys, files this Complaint on behalf of himself and other similarly situated current and former employees of American Express Company ("AMEX" or the "Company"), or its predecessor companies, who were participants in and beneficiaries of the American Express Retirement Savings Plan (the "Plan") and who were invested in the Company Stock Fund during the period of September 17, 2014, through February 11, 2015, inclusive (the "Class Period").  He alleges the following based on the investigation of his counsel, which included a review of the Plan's governing documents; documents provided by the Plan Administrator in response to a Plan request; the Plan's annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor; discussions with Plan participants; other SEC filings by

1

AMEX; other lawsuits against AMEX; press releases and other public statements issued by AMEX; and media reports about AMEX. Plaintiff believes that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

1.    This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against defendants AMEX, its Chief Executive Officer ("CEO"), and members of the Plan's Employee Benefits Administrative Committee ("EBAC") and the Plan's Retirement Savings Plan Investment Committee ("RSPIC"), by participants in the Plan, and on behalf of the Plan, to recover many millions of dollars of damage suffered in their retirement accounts due to breaches of fiduciary duties owed to them. These fiduciaries of the Plan, who owed "the highest duty known to the law" to Plan participants, breached those duties throughout the Class Period after they learned that AMEX stock price had become artificially inflated in value, and therefore had become an imprudent investment for employees' retirement savings, yet took no action whatsoever to protect Plan participants from the harm this artificial inflation would inevitably cause.

2.    AMEX, together with its subsidiaries, provides charge and credit payment card products and travel-related services to consumers and businesses worldwide. AMEX obtains revenues when its cards are used for purchases; from merchant fees that are withheld from what is remitted to merchants (reported as "discount revenues"); and from interest income paid by cardholders who maintain balances on their AMEX cards.

3.    In addition to issuing its own proprietary cards, AMEX has entered into a series of co-branding relationships with travel providers and retailers. Pursuant to these

co-branding relationships, AMEX extends and bears the credit risk, with the partner funding other loyalty perks. AMEX reports the discounted revenues and interest income generated through its co-branded cards in its U.S. Card Services operating segment. U.S. Card Services is AMEX's largest and most important reporting segment, contributing more than 43% of the $28 billion in revenues net of interest expenses that AMEX reported on a consolidated basis for fiscal 2013 (ended December 31, 2014).

4.     Since 1999, AMEX has had an exclusive co-branding arrangement with Costco Wholesale Corporation ("Costco") for Costco's United States business.  AMEX also had a separate co-branding agreement with Costco's Canadian operations.  Over the past several years, Costco's net sales have consistently grown, increasing from $70 billion in 2009, to $76.2 billion in 2010, to $87 billion in 2011, to $97 billion in 2012, and reaching $102.9 billion in 2013.  Historically, and throughout the Class Period, AMEX did not separately disclose in detail or identify the revenues, loan volume or card issuance that the Company generated from it U.S co-branding agreement with Costco.

5.     On September 17, 2014, Costco Canada announced that it would not be renewing its co-branding relationship with AMEX Canada in favor of another Canadian bank that would issue a co-branded Costco MasterCard.  Shortly thereafter, analysts began to question whether AMEX's U.S. Costco co-branding contract was in danger of non-renewal.  News reports, quoting anonymous sources, stated that Costco was soliciting bids for its U.S. co-branding credit card business—reports that AMEX and Costco refused to confirm.

6.     Unbeknownst to investors, at this time, AMEX and Costco were in discussions about the renewal of the Costco U.S. co-branding agreement, which was not

set to expire until March 31, 2016, more than a year-and-a-half in the future.  AMEX had approached Costco early in order to discuss renewing the agreement.

7.     Although the public might have been able to speculate that AMEX was at risk of losing the U.S. Costco co-branding relationship upon its expiration in March 2016, it did not know that AMEX had decided to accelerate renewal discussions with Costco, and it certainly did not know the full extent of the financial damage losing the U.S. Costco co-branding agreement could have on the Company.

8.     AMEX had never disclosed in detail the financial impact of the U.S. Costco co-branding agreement on its reported financial results.  In fact, the U.S. Costco co-branding contract was highly material to AMEX's business, representing in 2014 8% of the Company's revenues, 20% of its outstanding loans and 10% of its cards issued worldwide.  But to the investing public, Costco appeared to be just one among many marketing partners, and there was no reason to think that this particular relationship was more important than any other to AMEX's bottom line.

9.     During the Class Period, AMEX failed to disclose that its co-branding agreement with CostCo was at risk, and misled investors into believing that its relationship was longstanding and a valuable one that would continue. Moreover, by concealing just how material and significant the U.S. Costco co-branding relationship was to the Company's business and financial prospects, AMEX misled and overstated to investors its continuing revenue growth prospects by not disclosing that its CostCo relationship was at risk.  As a result, AMEX common stock traded at artificially inflated prices, reaching a Class Period high of nearly $95 per share on December 29, 2014.

10.     Suddenly, on February 12, 2015, AMEX shocked the market by announcing that it had lost the U.S. Costco co-branding relationship and that the financial impact of that loss would be severe.  AMEX disclosed that the U.S. Costco co-branding agreement generated 8% of the Company's revenues in 2014, that one in ten U.S. AMEX cards had been issued pursuant to the U.S. Costco co-branding arrangement, and that 20% of AMEX's outstanding loans had been made pursuant to that agreement.  Finally, as a result of the loss of the Costco U.S. co-branding agreement, AMEX stated that the Company's 2015 and 2016 profits would suffer, and that the Company would not be able to make any headway on its previous efforts to increase earnings per share ("EPS") by 12% to 15% during 2015 and 2016; AMEX would have to postpone such growth until 2017 at the very earliest.

11.     In response to this announcement, the price of AMEX common stock plummeted from its close of $85 per share on February 11, 2015, to close at $77.53 per share on February 13, 2015, a decline of nearly $8 per share or approximately 10%. Analysts expressed shock at the impact that the loss of the U.S. Costco co-branding agreement would have on AMEX and publicly questioned why the Company had never disclosed the financial impact of the U.S. Costco co-branding agreement.

12.     AMEX disguised the full extent of its CostCo relationship and the risks of its non-renewal to mask the immediate and long-term impact of fee cutting trends while it bought time to land new branding clients and/or transition towards developing other higher margin revenues.

13.     The Plan is a defined contribution plan sponsored by AMEX for eligible employees of the Company.  Among the investment options available to Plan participants

is the Company Stock Fund, which, according to the Plan, is "a unitized fund, the assets of which shall at all times be invested exclusively in Company Stock plus, to such limited extent as is determined to be necessary to meet liquidity needs, cash equivalents or similar liquid investments."

14.     The Plan, like any ERISA plan, designated certain fiduciaries, who were charged with monitoring and overseeing all of the Plan's investments, including the Company Stock Fund, and communicating with Plan participants regarding these investments.  Under the Plan, these fiduciaries were the EBAC and RSPIC as well as AMEX's CEO.  These fiduciaries are the defendants in this case.

15.     Among the most important duties of the AMEX's Plan fiduciaries was ensuring that each Plan investment option remained prudent—including the Company Stock Fund.  Notwithstanding the Plan's directive that the Company Stock Fund be invested "exclusively" in AMEX stock, or any other language in the Plan that attempted to take decision-making responsibility out of the hands of the Plan's fiduciaries, each Plan fiduciary was obliged under the law to ensure that investment of employee retirement funds in the Company Stock Fund remained a prudent option based on what each fiduciary knew at the time.  This responsibility to ensure the prudence of the Company Stock Fund cannot by law be delegated or abnegated or otherwise avoided.

16.     Defendants knew or should have known that the Company Stock Fund had become imprudent during the Class Period.  The CEO knew or should have known the true status of negotiations with one of AMEX's largest customers, responsible for 8% percent of its revenues, and as a Sarbanes-Oxley signatory was directly responsible for AMEX's financial reporting.  Defendants Koslow and Sisti were deeply involved in

6

AMEX's operations, and were officers and board members of AMEX's subsidiaries engaged in loans and receivables financing, so they knew or should have known the true status of the CostCo negotiations and importance to AMEX.  Defendant Cosgrove was responsible for AMEX's marketing and partner agreements, which included the Costco co-branding agreement, so she knew or should have known the true status of the CostCo negotiations and their importance to AMEX.  Defendants Ferris and Vocaturo were responsible for finance and network engineering and optimization, respectively, which serve operations, so they knew or should have known the true status of the CostCo negotiations and importance to AMEX.

17.     Defendants knew how important the CostCo relationship was to AMEX's financial health.  They also knew that the impact of the CostCo relationship to AMEX's bottom line had not been disclosed to the public.  Thus, once they learned that AMEX was desperately trying to keep the relationship from ending, and that the relationship was in danger of ending well before the March 2016 expiration of the co-branding agreement, they knew or should have known that the loss of the CostCo relationship, and the negative effect that that loss would have on AMEX's performance, would cause a sharp drop in AMEX's stock price as the market reacted to adjust to reduced forecasts for AMEX's revenues. They knew that AMEX's disclosure about CostCo would signal negative trends to the market about AMEX's ability to sign and retain other higher margin co-branding agreements.  The market's lack of all material information regarding the CostCo relationship's stability and its financial significance to AMEX artificially inflated the value of AMEX's stock price and thereby made the Company Stock Fund an imprudent investment—a fact that defendants also knew or should have known.

Defendants were obligated, as fiduciaries, to take action to protect Plan participants from the harm of this imprudent investment.

18.     Any Plan participant who purchased shares of the Company Stock Fund during the time when the stock was artificially inflated was buying it at a falsely high price.  When the fraud was inevitably revealed, and the stock price returned to a level that actually reflected its value, those purchasers suffered considerable losses and were damaged as a result.  Even if the stock price were to recover at some point down the road, those purchasers would miss out on some measure of gains because their purchase price had been artificially high.

19.     Plan participants who simply held shares of the Company Stock Fund during the Class Period were damaged as well, because they held an imprudent investment during a time when (had they known the truth) they could have shifted their holdings into a different, prudent investment trading at an accurate value, and thus their damages constitute the difference between the performance of that other prudent investment and the imprudent one they actually held.

20.     Defendants should have recognized that AMEX's artificially inflated stock would ultimately result in the aforementioned injuries to Plan participants.  And once they recognized that fact, they should have taken immediate action to prevent, or at least mitigate, those injuries.

21.     Defendants could have taken at least two actions to fulfill their fiduciary duty.  First, they could have acted to correct the artificial inflation of the Company's stock, which, in turn, would have made the Company Stock Fund once again a prudent investment.  In other words, defendants simply could have told the public the truth.

Defendants were well-positioned to take this step.  After all, who better than the CEO to effectuate truthful and accurate financial reporting to the public?  The CEO could easily have required disclosure in AMEX's SEC filings or the immediate filing of an 8-K.  The other defendants also could have worked to effectuate the necessary public disclosure— particularly defendants Koslow and Sisti, who were officers and/or directors of various public AMEX subsidiaries and therefore knowledgeable and familiar with disclosure obligations.

22.     Disclosure of this kind would have been consistent with defendants' obligations under ERISA as fiduciaries, and also with the Company's obligations under the federal securities laws—which, after all, require publicly-traded companies to be truthful and accurate in their financial reporting.

23.     Defendants cannot excuse their failure to tell the truth by claiming that, at the time, they could reasonably thought it would have done more harm than good to do so.  Certainly disclosing the truth about a fraud is likely to have a negative impact on a company's stock price, but that negative impact will only get worse the longer the fraud goes on.  Neither ERISA nor the securities laws permit the ongoing sanctioning of fraud under any circumstances.

24.     Defendants could have taken other actions to protect Plan participants as well. The RSPIC could have halted or ceased offering the Company Stock Fund, or issued new investment guidelines closing the Company Stock Fund to new investments until such time as the fund was no longer imprudent (that is, until the Company stock price was no longer artificially inflated).

25.     The CEO had the power to amend the Plan itself at any time, and thus could have amended the Plan to suspend new investments in the Company Stock Fund, or remove the Company Stock Fund as an investment option altogether, until such time as the fund was no longer imprudent.

26.     Preventing new investment in the Company Stock Fund would not constitute insider trading under the securities laws.  To the extent it triggered some disclosure obligation of the Company, such disclosure would be a good thing considering that disclosure of the truth was the other option defendants could have exercised to protect Plan participants from the harm of the Company's artificially inflated stock price.

27.     Instead, Defendants allowed their employee Plan participants to whom they owed their fiduciary duties to purchase and hold an imprudent investment throughout the Class Period without taking action to protect them in any way.  AMEX's stock price went from over $90 per share to $70 per share, and dropped more than 20% when the truth emerged.  Defendants are directly responsible as fiduciaries for this enormous harm that their breaches of their duties caused.

## I.      JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

29.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and defendant AMEX and maintains its primary place of business in this district.

## II.     THE PARTIES

30.     Plaintiff Syed Samir Hussain is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   He is a former employee of AMEX who was and continues to be a participant in the Plan.  He purchased and held shares of AMEX's stock in his Plan retirement savings account during the Class Period.

31.     Defendant American Express Company ("AMEX") is based in New York, New York, and, at relevant times, is and was the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).  Additionally, AMEX was a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had discretionary authority and control regarding the management of the Plan and the Plan's assets.  AMEX has approximately one billion shares of stock issued, and trades on the NYSE under the ticker symbol "AXP."

32.     At all times, defendant Kenneth Chenault ("Chenault") is and was the Chairman of the AMEX's Board of Directors and the Company's CEO.  At all times, Chenault was a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

33.     At all times, defendant Meredith Cosgrove is and was the Vice President of Marketing and Partner Management at AMEX.  Cosgrove was also a member of the EBAC, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because she had discretionary authority and control regarding the management of the Plan and the Plan's assets.

34.     At all times, defendant Stephen Ferris is and was the Vice President of Finance at AMEX.  Ferris was also a member of the EBAC, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

35.     At all times, defendant Dean Vocaturo is and was the Vice President of Network Engineering and Optimization at AMEX.  Vocaturo was also a member of the EBAC, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

36.     At all times, defendant John Koslow held various positions with AMEX subsidiaries engaged in the operation of financing loans and receivables, including Assistant Treasurer of American Express Travel Related Services Corp.; Director, Vice President, Secretary and Director of American Express Receivables and Financial Corp. VIII, LLC; and Vice President, Treasurer and Director of American Express Receivables and Financing Corp. II..

37.     Koslow was also a member of the EBAC, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

38.     At all times, defendant Peter Sisti held various positions with AMEX subsidiaries engaged in the operation of financing loans and receivables, including Director of American Express Credit Corp.; President, and Director of American Express Receivables and Financial Corp. VIII, LLC; and Director of American Express Receivables and Financing Corp. IV, LLC..

39.     Sisti was also a member of the EBAC, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

40.     At all times the individuals who were Plan fiduciaries were acting within the scope of their authority for AMEX and under AMEX's control.

### III.    AMEX'S PLAN AND THE PLAN FIDUCIARIES

41.     The Plan is a defined contribution benefit plan that is sponsored by AMEX for eligible employees and is subject to ERISA.  Employees can elect to defer up to 10% of their compensation into the Plan, and AMEX will make an automatic contribution for some employees of 5% (subject to certain restrictions).

42.     The Plan is governed by the Fifteenth Amended and Restated Plan document, which describes how Plan participants may contribute to retirement accounts through various investment options.  Section 6.2 of the Plan describes the investment options for the Plan, including the Company Stock Fund.  While the Plan intends for the Company Stock Fund to always be one of the investment options, it recognizes that the RSPIC has the authority to cease offering the fund if it was an imprudent investment.

43.     Section 6.2 states, in relevant part:

**6.2 Investment Options**
(a) Company Stock Fund. It is the intention of the Company that the Plan allow Participants to invest in the common stock of the Company. To that end, unless the Investment Committee determines that inclusion of the Company Stock Fund as an Investment Fund would not be in keeping with the Investment Committee's fiduciary duties under ERISA…

44.     Section 10.1 of the Plan defines the "Named Fiduciaries" as the EBAC and RSPIC.  The EBAC is the Plan Administrator and has the power and authority given under Section 10.3 to "prepare, file with the appropriate governmental agency, furnish or

make available to appropriate Participants, alternate payees, and beneficiaries, the various statements, reports, descriptions, registrations and other documents all as required by ERISA."

45.     The RSPIC is responsible for the investment options under the Plan. Section 10.4 which describes the duties and powers of the RSPIC states:

> Without limiting the scope of such other duties, responsibilities and authority as may elsewhere in the Plan or Trust Agreement be specified as belonging to it, the Investment Committee shall have the power, the duty, and the complete and exclusive discretion to: *oversee the Company Stock Fund in accordance with applicable law*…  (emphasis added).

45.     Thus, if investment in the Company Stock Fund contravenes applicable law—like if it becomes imprudent under ERISA—the RSPIC is empowered to take necessary action, including temporarily ceasing to offer the Company Stock Fund until such time as it becomes a prudent investment again..

46.     In addition, on December 19, 2014, a Fifteen Amendment to the Plan was adopted.  With this amendment, the Compensation and Benefits Committee of the Board of Directors specifically gave CEO Chenault the power to amend all of the Company's "broad-based benefits plans," including the Plan.  Thus, with this amendment, the CEO gained broad discretion to change the rules that governed the Plan, including to the extent necessary to cure any non-compliance with ERISA.

47.     Based on these Plan provisions, throughout the Class Period, the defendants, the EBAC and RSPIC members and CEO Chenault, had the power and authority to take action to cease offering the Company Stock Fund under the Plan, if necessary, to achieve compliance with ERISA or to correct any breaches of fiduciary duty toward Plan participants.  These defendants could have used their authority over any

third-party investment manager to close the Company Stock Fund to new investments while AMEX's stock price remained artificially inflated and therefore imprudent. The CEO could have amended the Plan itself to accomplish this same end. These defendants further could also have made disclosure to the Plan participants.

## IV.  AMEX'S FRAUD MADE ITS STOCK IMPRUDENT

48.    Defendant AMEX's products and service offerings include charge and credit card products; payments and expense management products and services; consumer and business travel services; stored value products, such as traveler's cheques and other prepaid products; and network services. The Company's products and services also comprise merchant acquisition and processing, servicing and settlement, point-of-sale, and marketing and information products and services for merchants; fraud prevention services; and the design of customized customer loyalty and rewards programs.

49.    Defendant AMEX sells its products and services to consumers, small businesses, midsized companies, and large corporations through direct mail, online applications, in-house and third party sales forces, and direct response advertising.

50.    The Company has four operating segments: U.S. Card Services, International Card Services, Global Commercial Services, and Global Network & Merchant Services. The Company has four geographic reporting segments: the United States; Europe, Middle East and Africa; Japan, Asia/Pacific and Australia; and Latin America, Canada and Caribbean.

51.    AMEX generates the following types of revenue:

• *Discount revenue,* AMEX's largest revenue source, which represents fees generally charged to merchants when Card Members use their cards to purchase goods and services at merchants on its network;

• *Net cardfees,* which represent revenue earned from annual card membership fees;

• *Travel commissions and fees,* which are earned by charging a transaction or management fee to both customers and suppliers for travel-related transactions;

• *Other commissions and fees,* which are earned on foreign exchange conversions, card-related fees and assessments, Loyalty Partner-related fees and other service fees;

• *Other revenue,* which represents revenues arising from contracts with partners of AMEXs Global Network Services business, insurance premiums earned from Card Member travel and other insurance programs, prepaid card-related revenues, etc.; and

• *Interest on loans,* which principally represents interest income earned on outstanding balances.

52.     Within the Company's U.S. Card Services segment, AMEX issues cards under co-brand agreements with selected commercial firms. Co-brand card members typically earn rewards provided by the partners' respective loyalty programs based upon their spending on the co-brand cards, such as frequent flyer miles, hotel loyalty points and cash back. According to AMEX, co- branding provides lucrative business as "these partnerships can generate high-spending loyal customers."

53.     Costco is a publicly-traded membership warehouse club founded in 1976 in San Diego, California that opened its first membership warehouse store in Seattle in 1983.  Costco operates an international chain of membership warehouses that carry generally higher quality brand name merchandise, generally packaged in larger quantities and generally priced at lower prices than are typically found at conventional wholesale or

retail sources. Costco warehouse stores serve small-to-medium-sized businesses and individuals, and a customer must have a Costco membership to shop at Costco.

54.     By December 31, 2014, Costco had grown to operate 663 warehouse stores, had 6.9 small business and 31.6 million individual members, and had achieved more than $110.2 billion in annual sales.

55.     AMEX had separate co-branding agreements with Costco Canada and U.S. Costco.  The Company's agreement with Costco Canada was set to expire on December 31, 2014; its agreement with U.S. Costco was to expire on March 31, 2016.

56.     On September 17, 2014, Costco announced that, beginning in January 2015, Costco Canada would no longer accept AMEX cards at Costco's Canadian warehouse stores. Instead, Costco's Canadian warehouse stores would now accept MasterCard.  In an email to AMEX-brand customers that was widely picked up by the financial media, Costco stated that U.S. Costco stores would continue accepting AMEX cards.

57.     At or about the start of the Class Period, unbeknownst to investors, AMEX and Costco were in discussions about the renewal of the Costco U.S. co-branding agreement because AMEX had decided to accelerate contract renewal discussions well in advance of the expiration date.

58.     On October 15, 2014, after the close of trading, AMEX issued a press release announcing its financial results for the third quarter of 2014, the period ended September 30, 2014.  Defendant CEO Chenault commented on the results stating, in pertinent part, as follows:

We delivered another solid quarter of financial results.... Card Member spending

was up 9 percent, a modest acceleration from last quarter, and loan balances grew 5 percent. Revenues continued to rise at a steady pace, but the growth rate is still below our long-term target.

On the cost side of the ledger, operating expense growth remained on track to come in well below our target for the full year and that's one of the factors that provided the flexibility to invest in both the core business as well as some newer initiatives.

We developed new partnerships and services with Uber, Apple Pay and McDonald's that are helping us to capitalize on the convergence of online and offline commerce.

At the same time, initiatives like the Amex EveryDay Credit Card and OptBlue are helping to make our brand more welcoming and inclusive as we expand into markets not traditionally served by American Express.

Over the last couple of years we have delivered solid earnings through a combination of disciplined expense control, a strong balance sheet and targeted investments in growth initiatives. While the economy is stronger, it is not growing as fast or as steadily as most people would like, and those same levers will continue to be an important part of our strategy.

Our focus will be on delivering earnings growth in an environment that is characterized by rapidly changing technologies; intense competition; regulation and an economy that may continue to grow at only a modest pace.

59.     Later that night, AMEX held a conference call with analysts and investors

to discuss the Company's earnings release and operations. During the conference call,

AMEX's Chief Financial Officer ("CFO") mentioned the loss of the Costco Canadian

co-branding contract and noted that AMEX has different contracts with Costco U.S.

stating, in pertinent part, as follows:

> ... I wanted to touch on the pending loss of our relationship with Costco in Canada. While we are disappointed that we will no longer continue this partnership in Canada, we are excited about the launch of our new cash-back product in the Canadian market, and are focused on retaining many of our customers.
>
> I'll note that *we have separate agreements with Costco in each of the several markets where we maintain a partnership, and have a longer and more significant*

*relationship with Costco in the US, dating back over 15 years.* As with any long-term partnership, *we work with Costco on an ongoing basis to find ways to drive value for both parties going forward,* never losing sight of the fact that we are serving the same customers.

Many of you are aware, the environment for co-branded products has become increasingly competitive. From our side we remain focused on developing attractive value propositions for our card members and co-brand partner that still drive economics for our shareholders.

60.     The statements referenced above by AMEX's officers and its email were materially false and misleading because they failed to disclose the following adverse facts which were known or recklessly disregarded by them as follows:

   a)  that AMEX had decided to accelerate contract renewal discussions for the U.S. Costco co-branding agreement, had approached Costco and was attempting to negotiate a renewal of the agreement which was set to expire in March 2016, and that there was a risk that Costco would cancel the agreement early;

   b)  that the failure to secure a renewal of the U.S. Costco co-branding agreement would have a significant near-term financial impact;

   c)  that the U.S. Costco co-branding agreement generated approximately 8% of AMEX's worldwide billed business with over 70% of the spending on the product occurring outside of Costco warehouses. In addition, another 1% of worldwide billings was generated by other AMEX card members' spending at Costco;

   d)  that U.S. Costco co-branding was 20% of AMEX's worldwide loans and 10% of AMEX's worldwide cards in force; and

   e)  as a result of the foregoing, AMEX and its officers lacked a reasonable basis for their positive statements about the Company and its prospects, and the expected continuation of the Costco agreement.

61.     On October 28, 2014, AMEX filed its quarterly financial report on Form 10-Q with the SEC for the period ending September 30, 2014.   CEO Chenault filed a certification of the 10-Q.   The Form 10-Q did not disclose that AMEX had made a decision to accelerate renewal discussions for the U.S. Costco co-branding agreement far

in advance of the agreement's expiration date and that a failure to secure renewal of the co-branding agreement would have a significant near-term financial impact on the Company.  The Form 10-Q also did not disclose the material financial gains generated from the U.S. Costco co-branding agreement.

62.     Under the rules and regulations governing the preparation of the Form 10-Q,  AMEX was required to make disclosures required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii). Item 303(a) requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Given the financial contributions of the U.S. Costco co-branding agreement, AMEX's decision to accelerate renewal discussions for the U.S. Costco co-branding agreement created a known uncertainty that the Company reasonably expected to have "a material favorable or unfavorable impact on the sales or revenues or income from continuing operations," which should have been disclosed in the Form 10-Q.

63.     Following AMEX's announcement of its earnings release, and its reassurances about the U.S. Costco relationship, its stock price quickly rose to over $90 per share where it traded for months, peaking at $94 per share.

64.     In late 2014, AMEX filed prospectuses for two debt offerings with the SEC on November 6, 2014 and December 3, 2014, respectively.  The shelf registration statements for these offerings were required to disclose that AMEX  had made a decision to accelerate renewal discussions for the U.S. Costco co-branding agreement far in advance of the agreement's expiration date and that a failure to secure renewal of the co-branding agreement would have a significant near-term financial impact on the Company.

The registration statements were also required to disclose the material financial gains generated from the U.S. Costco co-branding agreement.  However, AMEX did not make these disclosures.

65.     On January 21, 2015, after the close of trading, AMEX issued a press release announcing its financial results for the fourth quarter and full year of 2014, the period ended December 31, 2014.  For the fourth quarter, the Company reported net income of $1.4 billion and diluted earnings per share of $1.39 per share. Defendant Chenault commented on the results stating, in pertinent part, as follows:

> Solid results this quarter reflected the underlying themes that have characterized our performance throughout 2014: higher Card Member spending, increased loan balances, tight control of operating expenses and a substantial return of capital to shareholders through share repurchases.
>
> Fourth-quarter Card Member spending rose 6 percent (8 percent FX adjusted). Volumes for the year crossed the trillion dollar mark for the first time, reflecting the progress we've made in building customer loyalty, adding new cards and expanding the network of merchants who accept our products. Loan balances were up 7 percent in the U.S., continuing the progress we've made throughout 2014. We continue to see opportunities to grow this portfolio with existing and new customers without significantly changing the overall risk profile of the company.
>
> Tight controls on the cost side of the ledger continued to give us the flexibility to invest in growth opportunities. And, as in the second quarter, a substantial gain allowed us to accelerate some critical initiatives: reengineering to make American Express more efficient; renewing a key partner relationship; and making additional investments to grow our business and drive innovation in the world of payments and commerce.
>
> We've made very good progress against the backdrop of an uneven global economy and the negative impact of a strengthening U.S. dollar.  We see many opportunities for growth, but at the same time, we face competitive and regulatory challenges. Our aim is to continue to capitalize on the opportunities while dealing with the challenges as we enter 2015.

66.     Later that afternoon on January 21, 2015, AMEX held a conference call with investors and analysts to discuss the Company's earnings results and operations.

During the conference call, AMEX's CFO was directly asked about the Costco U.S. co-branding arrangement. The following exchange took place:

> Donald Fandetti: Yes, Jeff, I was wondering if you could give us your thoughts on when we might hear on the Costco U.S. deal? And if you could talk a little bit around that, how you balance what appear to be sort of lighter economics on these co-brand deals with the potential lumpiness of a loss of the deal, how you sort of think through that?

> CFO Jeffrey C. Campbell: Well, I appreciate the question, Don. Clearly, Costco is a very important and long-term partner of ours. Our U.S. relationship goes back to the 1990s. We think we have been great partners and have created a lot of value for their members, our Card Members, and for both companies. *Now, I would point out to you that - I don't think we've said anything about any ongoing discussions we're having with Costco, obviously with very important partners, we are always working every day to evolve the relationship, to make it better and frankly to make sure it's working for both parties. And you can presume we're doing that with Costco as we're doing it with all of our partners at any time. And if and when we have any news, as we did with Delta which we chose to renew early, we would certainly tell you.*

> In terms of thinking about the economics of these things, you've certainly heard a number of us, both Ken and I and some of our colleagues talk about the competitive environment for co-brands in recent months and quarters, and that's true. I think you have to balance those comments with the fact these are still one of many good economic growth opportunities we have as a company. And while, yes, the environment has become competitive and while certainly there are cases where we conclude because we're pretty selective that we think we're better off not either getting into or proceeding with certain kinds of co-brand partnerships because we have so many other opportunities in our proprietary business. As a general matter, these still are attractive and important parts of our overall business model. And when we have great partners where our interests are really aligned, and I'll go back to the recent renewals of Delta and Starwood, we think we can create great value together and for all parties involved.

67.     These statements by AMEX's CFO were materially false and misleading because they did not provide known disclosure about the tenuous status of AMEX's agreement with Costco.

68.     With the release of its earnings on January 21, 2015, AMEX also announced that it planned to layoff 4,000 workers during the upcoming year, or

approximately 6% of its workforce.  The *Associated Press* reported that AMEX stated that the job cuts were "part of a companywide efficiency drive."

69.     Then, on February 12, 2015, before the opening of trading, AMEX issued a press release entitled "American Express and Costco U.S. Partnership Agreements Set to End March 31, 2016."  The release quoted CEO Chenault stating, in pertinent part, that AMEX had "began discussions on a possible renewal with Costco well in advance of the contract expiration," but that the Company had been "unable to reach terms that would have made economic sense," and that after March 31, 2016, AMEX cards could no longer be used at Costco.

70.     Shortly after the issuance of the press release, AMEX held a conference call with analysts and investors to discuss the non-renewal of the U.S. Costco co-branding agreement and related issues.  At the start of the call, CEO Chenault acknowledged that the non-renewal would have a "negative impact on earnings and revenue growth in 2015 and 2016" and that the Company sought to accelerate contract renewal discussions "knowing that it could have a near-term financial impact ...."

71.     AMEX's CFO detailed the impact of the non-renewal, stating as follows:

As Ken said, we intend to work to offer value propositions that our card members from the Costco relationship will find appealing while also pursuing our many other growth opportunities, both of which will entail additional marketing dollars. The cumulative effect of all of these changes will have a significant impact on our 2015 and 2016 results.

As we have thought about how to best position the company for continued long-term growth, we have considered all of these developments and all of our growth opportunities. And I would say that with respect to Costco U.S., there are a number of areas of the transition that we will need to work through in the coming months.

That said, the overall impact of all of these factors causes us now to expect that

overall earnings per share growth in 2015 will likely be flat to down modestly year over-year as we manage through these near-term headwinds and invest aggressively to proactively prepare for the termination of the Costco U.S. partnership in 2016.

The full outlook for 2016 is somewhat more complex at this early stage, but we do expect to return to earnings per share growth even with the termination of our Costco U.S. partnership, which is set to expire at the end of Q1 in 2016.

As all of these items play out over the next two years, we will likely have more unevenness in our performance quarter to quarter than has been typical of our business. Looking beyond 2016, we believe that our 12% to 15% EPS growth target remains appropriate beginning again in 2017, which really will be the first period where growth rates are not impacted by Costco U.S. and our other co-brand partner renewals.

Let me now provide some additional details on the moving parts associated with our Costco U.S. relationship, including some of the mechanics by P&L line. We are still working through the exact timing and sizing associated with some of these items but we hope this context will be helpful as you think about the future impact on our performance. We will provide additional updates during our Investor Day, which will take place on March 11.

First for context, in 2014 the Costco U.S. co-brand was approximately 8% of our worldwide billed business with over 70% of the spending on the product occurring outside of Costco warehouses. The Costco U.S. co-brand's portfolio makes up about 20% of worldwide loans and about 10% of worldwide cards in force. In addition, about another 1% of our worldwide billings come from other American Express Card members spending at Costco.

We could begin to see a modest slowdown in billings, loans and revenue growth associated with the Costco U.S. co-brand over the course of 2015, and we would expect this slowdown to increase as we near the end of the contract.

72.     During the question-and-answer portion of the conference call, these

AMEX senior officers were asked why AMEX had not disclosed the details of the U.S.

Costco co-branding agreement; they responded that the information was not required to

be disclosed. The following exchange took place:

Moshe Ari Orenbuch: ... *Just the follow-up is, just out of curiosity, with8% to the volume and 20% of the receivables, how was this not - those numbers not disclosed before?* I mean, isn't that - *doesn't that meet a threshold for disclosure?*

Jeffrey C. Campbell: No.... [t]he basic threshold is more driven by revenues
and is around 10%. There are some other disclosures rules as well; you would
note we've called out Delta in the past, but that's in the guise - or in the context of
our airline concentration overall. But when you look at Costco, its metrics don't
actually hit any of the thresholds.

73.     In response to the non-renewal of the U.S. Costco co-branding agreement
and the disclosure of the financial impact of the non-renewal, the price of AMEX stock
declined over the next two trading days -falling from $85.40 per share on February 11,
2015, to close at $77.53 per share on February 13, 2015, on extremely heavy trading
volume, for a decline of nearly $8 per share, or approximately 10%.

74.     Analysts unanimously acknowledged that AMEX had concealed from the
market the materiality of the U.S. Costco co-brand to AMEX's business and financial
prospects, concealing the negative impact losing it would have on AMEX, causing most
major investment firms to downgrade their earnings models and price targets on AMEX
stock.  For example:

- *Barclays* issued a report lowering its price target from $96 to $85 per share,
stating, in pertinent part, that *"Costco represents a meaningful proportion of
AXP's business,"* and that AMEX had "disclosed the proportion of business
generated by the Costco co-brand relationship, *which was much more significant
than we had previously estimated."*

- *JP Morgan* issued a report cutting its price target down from $90 to $85 per share,
stating, in pertinent part, that the firm was *"cutting [its] 2015 and 2016
estimates for American Express to reflect the loss of the Costco co-brand
partnership,"* and that *"the renewal of the contract was an asymmetric risk
because consensus estimates implicitly assumed renewal"* and that
"[c]onsequently, *while we are lowering our 2015 and 2016 estimates by 9% and
13%,* respectively, we believe *risk to revised estimates has been materially
reduced."*

- *UBS*  issued a report lowering its price target from $90 to $83 per share, stating, in
pertinent part, that the firm was *"Lowering Forecasts and Valuation as Major
Costco Partnership Dies,"*  emphasizing that *"[t]his is a significant relationship--
20% of worldwide loans, 10% of worldwide cards in force, 9% of worldwide
billed business,"*  that "Management noted that *cumulative effect of all the*

associated changes would have a '*significant impact on [the company's] 2015 and 2016 results'* and guided to 'flat to modestly down year-aver-year' EPS growth for 2015," and that UBS had consequently "lowered [its] 2015 EPS estimate 4% to $5.55 and [its] 2016 EPS estimate 8% to $5.65." The UBS report also highlighted the *"Marketing Expenses and Restructuring Charges,"* stating the presented *"a significant unknown,"* and that "[d]uring the update call, management noted that the company would 'invest aggressively to proactively prepare for the termination of the' agreement," emphasizing that AmEx had *"also mentioned potential restructuring charges."*

- *Evercore ISI* issued a report entitled *"Costco Loss Costs Dearly,"* lowering their price target to $82 per share, emphasizing *"COST business bigger than expected,"* and stating, in pertinent part, that *"billings and receivables growth are expected to decline sharply."*

- *Jefferies* issued a report lowering its price target from $95 to $85 per share, emphasizing, in pertinent part, that the firm had *"lowered [its] FY15 and FY16 estimates as [it] expect[ed] near-term marketing and rewards expenses to increase,"* and that it would *"continue to stay on the sidelines on AXP as [it] believed] top-line headwinds [were] likely to persist."* The *Jefferies* report also emphasized that the *"[f]inancial implications of the Costco relationship [were] not immaterial"* and that *"[management noted that over 70% of the spending for these customers occurred outside of Costco where arguably AXP incurs higher margins than within the Costco network."*

- *RBS* issued a report entitled *"Amex Loses Crown Jewel Costco US Cobrand Relationship - Materially Negative,* High Sector Competition Hits Home," which stated, in pertinent part, that *"the loss f its key Costco US cobrand relationship . . has meaningful ramifications for the business,"* and that the disclosure that "Costco cobrand card spending was disclosed as 8% of the company's total spending volume, 20% of loans, and 10% of US cards in force [was] *much more meaningful than most believed, in our view."* The RES report further cautioned that *"Costco was AXP's crown jewel of cobrand partners, and in our minds strikes at the heart of our negative view on Amex* - competition is very high in the company's business, *and the loss of this key relationship exemplifies challenges here."* The report further emphasized that *"the loss clearly has meaningful earnings implications as well"* and that RBS "remain[ed] negative on AXP shares...."

- *RBS* issued a second report on February 13, 2015, this time lowering its price target to $74, emphasizing that *"[m]agnitude of the relationship to the business was previously undisclosed, but is also very sizable -* **8%** *of worldwide billed business volume, 20% of worldwide loans, and 10% of cards in force."* In its second report, RBS added that "[w]hile Amex aims to offset the Costco loss with new business, *we are concerned this will prove challenging given high industry competition and magnitude of the lost relationship."* This report further

emphasized that *"[a] onetime restructuring charge is also likely forthcoming in 2015* - as seems par for the course in the past few years - *to help address challenges,"* and stating that the firm's "price target comes down to $74."

- *Credit Suisse* issued a report lowering its price target from $83 to $78 which stated, in pertinent part, that *"Up to -$90Bn/yr. of Spending Could be at Risk.* We believe approximately $90Bn (or 9% of Amex's worldwide spend) is associated with Costco US, either within the retailer's stores or on Costco cobranded cards. Additionally, we estimate that over $14Bn (or 20% of Amex's worldwide loans) are related to Costco, which we believe will be sold to the new issuer."

- *Oppenheimer* issued report entitled *"The Hits Keep Coming"* which stated, in pertinent part, that "[w]hile AXP headwinds have been known for some time, *this morning's announcement of the loss of the Costco US partnership only adds to the list and duration of EPS pressures. . . . We learned today that the company faces EPS pressures through at least 2016"* and that *"[m]anagement guided that it would not return to the long-term EPS growth goal of* 12-15% *until 2017+ and 2015 would be flat at best."*

75.     On or about February 18, 2015, corporate debt ratings agency Moody's issued a ratings report entitled "Costco Loss Is Credit Negative for American Express' Card ABS." Fitch's report on or about February 18, 2015 also found that the loss of the U.S. Costco relationship added earnings pressure to the Company's existing near-term challenges.

76.     AMEX and its senior officers disguised the full extent of its CostCo relationship and the risks of its non-renewal to mask the immediate and long-term impact of fee cutting trends while it bought time to land new branding clients and/or transition towards developing other higher margin revenues. They knew that AMEX's disclosure about CostCo would signal negative trends to the market about AMEX's ability to sign and retain other higher margin co-branding agreements.

77.     As a result of AMEX's materially false and misleading statements and omissions as set forth above, AMEX's common stock traded at artificially inflated prices during the Class Period.  Plan participants who invested in the Company Stock Fund

purchased AMEX stock at inflated prices during this time; they also held AMEX stock while forgoing other, prudent investment alternatives in reliance on the stock price and public news about AMEX.

78.     When the truth came out, AMEX's stock price fell steeply as the negative news factored into a new stock price, and the artificial inflation of the price dissipated. Plan participants, such as plaintiff and the other members of the class, were significantly damaged as a result.   Defendants, who were the fiduciaries tasked with protecting plaintiff and the class from such harm, are directly responsible for these damages.

## V.     THE FIDUCIARY BREACHES

79.     Throughout the Class Period, defendants knew or should have known that AMEX had not disclosed to the public the truth about the status of its negotiations with Costco over the U.S. Costco co-branding contract, and the potential size and impact that non-renewal of the contract would have on AMEX.   Defendants knew or should have known that AMEX made materially false and misleading statements to the public in its SEC filings, earning releases and conference calls.   Defendants knew or should have known that AMEX's stock price was artificially inflated by its non-disclosures and false and misleading disclosures to the public, and that these made the Company Stock Fund an imprudent investment.

80.     Defendants, who are the CEO and members of the EBAC and RSPIC, knew or were well-positioned to know of the Company Stock Fund's imprudence during the Class Period.   Each was an officer of AMEX and knew or had reason to know the truth about U.S. Costco-branding agreement from their position with the Company.

81.     There is no doubt that CEO Chenault knew that the U.S. Costco agreement was under negotiation, and that he knew well before it was publicly disclosed that agreement would not be renewed.  Chenault knew or should have known the true size of the CostCo relationship and the impact that non-renewal would have on AMEX's stock price.  Chenault also knew that AMEX had not provided full disclosure of either the status of its negotiations or the impact of its Costco relationship because he certified financial statements, personally made false and misleading statements at issue on analyst conference calls, and was present during other false and misleading statements made by the CFO on analyst conference calls without correcting them.

82.     Defendants Sisti and Koslow, who were members of the RSPIC, also knew or should have known of the status of the Costco relationship.  Each is an officer and board member for various AMEX's subsidiaries that were engaged in loans and receivables financing, and each was thus deeply involved in AMEX's operations.  These subsidiaries relied on AMEX's loans and receivables as inventory for their financing.  Sisti and Koslow knew or had to know exactly how much of the receivables and loans they financed came from U.S. Costco, and would have (or should have) known the status of the contract negotiations.  This knowledge would be necessary for their job functions and planning.

83.     Defendant Cosgrove, who was a member of the EBAC, was responsible for AMEX's marketing and partner agreements.  AMEX's co-branding agreements with both US Costco and Canada Costco were directly within her responsibilities.  It would not be surprising for her to have been personally involved in the renewal negotiations for both US and Canada; at a minimum, she knew or should have known contemporaneously

the status and progress of these negotiations.  She also knew or had to know the size of Costco as a marketing partner, the revenues that the relationship generated, the loans generated and number of cards outstanding.  She was likely under pressure to try to find new marketing relationships or to renew existing marketing relationships (such as with Delta) to replace or minimize the loss of US Costco before the news was made public

84.     Defendants Ferris and Vocaturo, who were members of the EBAC, were officers at AMEX responsible for finance and network engineering and optimization, respectively.   These officers served AMEX's day-to-day operations, so they knew or had to know the true status of the Costco negotiations and importance to AMEX.  Vocaturo worked on AMEX's interactive network systems.  He would need to know up-to-the-minute projections on current and future capacity by AMEX partners to access its systems.  Knowledge of the status of the Costco negotiations would be necessary for these defendants' job functions and planning.

85.     Notwithstanding this knowledge, these Plan fiduciaries did nothing to act upon that knowledge to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties.

86.     First, Defendants, but particularly the CEO and EBAC, had the power to disclose the truth to the public and to correct the artificial inflation, inasmuch as it was primarily the false public disclosures that had artificially inflated the stock price. Defendants could have stopped those misrepresentations from ever happening, or corrected them much earlier than they were ultimately corrected, which would have prevented all or some of the artificial inflation, and lessened the ultimate correction.

Either way, Plan participants' losses would have been mitigated, if not altogether prevented.

87.     Defendants cannot hide their inaction behind the securities laws.  In this situation, ERISA and the securities laws compelled defendants to take exactly the same action—tell the truth and correct the inflated stock price.  No law or duty required defendants to *prevent* the disclosure of the truth—quite the opposite.

88.     Second, defendants who were members of RSPIC, who appointed and oversaw the investment options under the Plan as well as any Investment Manager, had the power to prevent Plan participants from buying AMEX at inflated prices by closing the Company Stock Fund to new investments, or by issuing new instructions to the Investment Manager until the stock price was corrected (by disclosure of the truth to the public).

89.     Third, defendant CEO Chenault, who was given oversight power in the Plan's Fifteenth Amendment, had the power to amend the Plan to prevent Plan participants from buying AMEX at inflated prices by closing the Company Stock Fund to new investments, or by issuing new instructions to the Investment Manager until the stock price was corrected (by disclosure of the truth to the public).

90.     Critically, all of these powers remained available to defendants to exercise whether or not some or all of their fiduciary duties were delegated to others.

91.     These actions would not have caused more harm than good.  Simply preventing new purchases would not have constituted insider trading.  If the Plan fiduciaries needed to disclose the fact of the freeze to the public, such a disclosure (a) would not have been prohibited by the securities laws and (b) might actually have

encouraged the making of a fulsome disclosure to the public about the systemic overcharging and inflated revenues and earnings.

92.     In sum, defendants, who were the fiduciaries of the Plan, breached their fiduciary obligations to Plan participants. They allowed those to whom they owed the "highest duties under law" to purchase and hold Company stock at an artificially high price during the Class Period, knowing that damaging material information was not factored into the stock price or disclosed to the public.  No matter what happens to its stock price in the future—even if it recovered all of its losses—the Plan participants would still be injured because they were deprived of retirement money that otherwise would have rightfully been theirs from overpaying for the stock.

93.     And Plan participants who simply held AMEX's shares during the Class Period were injured as well, because they were prohibited from being able to invest in an alternative, prudent investment that would not have caused them the same losses during the Class Period.

94.     Millions upon millions of dollars were lost from the retirement accounts of AMEX employees. Defendants, as Plan fiduciaries, are directly responsible for this enormous harm that their breaches of duty caused.

## IV.     CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of himself and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in
> the Plan and whose individual accounts purchased and/or

held the AMEX Company Stock Fund at any time between
September 17, 2014, through February 11, 2015, inclusive.

96.     Excluded from the Class are defendants, other officers and directors of the

Company, members of defendants' immediate families and their legal representatives,

heirs, successors or assigns and any entity in which defendants have or had a controlling

interest.

97.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to plaintiff at this

time and can only be ascertained through appropriate discovery, plaintiff believes that

there are at least 36,811 members in the proposed Class.  Record owners and other

members of the Class may be identified from records maintained by AMEX or the Plan

and may be notified of the pendency of this action by mail, using the form of notice

similar to that customarily used in securities class actions.

98.     Plaintiff's claims are typical of the claims of the members of the Class as

all members of the Class are similarly affected by defendants' wrongful conduct in

violation of federal law complained of herein.

99.     Common questions of law and fact exist as to all members of the Class

and predominate over any questions solely affecting individual members of the Class.

Among the questions of law and fact common to the Class are:

a.     Whether defendants each owed a fiduciary duty to the Plan, to plaintiff
and to members of the Class;

b.     Whether defendants breached fiduciary duties owed to the Plan, plaintiff
and members of the Class by failing to act prudently and solely in the interests of
the Plan and the Plan's participants and beneficiaries;

c.     Whether defendants violated ERISA; and

33

d.     The extent to which Class members have sustained damages and the proper measure of those damages.

100.    Plaintiff's claims are typical of the claims of the members of the Class because plaintiffs and the other members of the Class each sustained damages or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

101.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

102.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

103.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

104.    Plaintiff also brings this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

## COUNT I
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Against All Defendants)

105.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

106.    At all relevant times, as alleged above, all defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

107.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

108.    A fiduciary's duty of prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or

beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

109.    Defendants' duty of prudence also obligated them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

110.    Defendants breached their duties to prudently manage the Plan's assets. During the Class Period, defendants knew that the AMEX Company Stock Fund had become an imprudent investment for Plan participants' retirement savings because AMEX had engaged in fraud by making false and misleading material statements to the Plan participants and the public, and withholding material disclosure from the Plan participants and the public about the stock that had artificially inflated its value.

111.    Accordingly, defendants should have taken appropriate responsive action by restricting transactions or new investments by the Plan in the Company Stock Fund or by effectuating disclosures that would have corrected the stock price and rendered the Company Stock Fund a prudent investment again.

112.    As such, between September 17, 2014 and February 11, 2015, Plan participants could not appreciate the true risks presented by investments in AMEX's stock and, therefore, could not make informed decisions regarding their investments.

113.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT II
### Failure to Provide the Plan Fiduciaries with Accurate Information
### (Against All Defendants)

114.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

115.    At all relevant times, as alleged above, defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

116.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of defendants included the responsibility to appoint, evaluate, and monitor other Plan fiduciaries, including, but not limited to, any "Investment Manager" to which certain fiduciary responsibilities were at least partially delegated.

117.    Defendants' fiduciary duty entailed ensuring that these other Plan fiduciaries each had truthful and accurate information to fulfill their respective jobs and duties as fiduciaries and to properly monitor, evaluate and oversee the Plan's investment in the Company Stock Fund.

118.     Under ERISA, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

119.     Defendants breached their fiduciary monitoring duties between September 17, 2014 and February 11, 2015, by failing to provide the public, and therefore their co-fiduciaries and their fiduciary delegates, with truthful and accurate information concerning AMEX's status of negotiations with CostCo, the potential impact of non-renewal and the prospects of non-renewal, and the prospects of AMEX stock as an appropriate retirement investment.

120.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.

121.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for:

A.     Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiff as class representative, and determining that plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.      Declaration that defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.      An Order compelling defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

D.      Imposition a Constructive Trust on any amounts by which defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining defendants from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

G.      An Order that defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in the Company Stock Fund in proportion to the accounts' losses attributable to the decline in the price of its common stock and/or the value of investment in alternative options under the Plan.

H.      Awarding the Plan and/or Plan participants rescission and/or money damages including pre-judgment interest;

I.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.       An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

K.       An Order for equitable restitution and other appropriate equitable monetary relief against defendants; and

L.       Such other and further relief the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

By:   ___/s/ Samuel E. Bonderoff_____
        Samuel E. Bonderoff

Jacob H. Zamansky
Edward H. Glenn Jr.
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
_samuel@zamansky.com_

ATTORNEYS FOR PLAINTIFFS